# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

KATHLEEN BROWN,
     Plaintiff,

Case No. 1:13-cv-267
Spiegel, J.
Litkovitz, M.J.

vs.

COMMISSIONER OF
SOCIAL SECURITY,
     Defendant.

**REPORT AND
RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application

for disability insurance benefits (DIB). This matter is before the Court on plaintiff's Statement

of Errors (Doc. 13) and the Commissioner's response in opposition (Doc. 21).

## I. Procedural Background

Plaintiff filed an application for DIB in May 2009, alleging disability since January 5,

2005, due to glaucoma, diabetes, depression, a shoulder operation, an aneurysm, a fatty liver,

anxiety, migraines and a fourth-grade education. (Tr. 276). On June 6, 2011, plaintiff, through

counsel, amended the alleged onset date to September 22, 2008, because plaintiff's earnings

records disclosed she was performing substantial gainful activity prior to that date. (Tr. 253).

Plaintiff's application for DIB was denied initially and upon reconsideration. Plaintiff, through

counsel, requested and was granted a *de novo* hearing before administrative law judge (ALJ)

Christopher McNeil. Plaintiff, plaintiff's case manager Thomas Van Brunt, two medical experts

(MEs), and a vocational expert (VE) appeared and testified at the ALJ hearing. On July 26,

2011, the ALJ issued a decision denying plaintiff's DIB application. Plaintiff's request for

review by the Appeals Council was denied, making the decision of the ALJ the final

administrative decision of the Commissioner.

## I. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable

physical or mental impairment that can be expected to result in death or that has lasted or can be

expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A).

The impairment must render the claimant unable to engage in the work previously performed or

in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §

423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation

process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment - *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities - the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing §§ 404.1520(a)(4)(i)-

(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the

2

sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir. 1999).

**B. The Administrative Law Judge's Findings**

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. The [plaintiff] meets the disability insured status requirements set forth in section 216(i) of the Social Security Act and is insured for disability benefits at least through the date of [the ALJ's] decision.

2. The [plaintiff] has not engaged in substantial gainful activity since September 22, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The [plaintiff] has the following severe impairments: right shoulder arthrosis and impingement (s/p arthroscopic subacromial decompression), degenerative cervical disc disease, affective disorder (variously diagnosed as major depressive disorder/mood disorder/adjustment disorder/bipolar disorder), and borderline intellectual functioning. (20 CFR 404.1520(c)).

4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the [ALJ] finds that the [plaintiff] has the residual functional capacity to lift/carry and push/pull up to 20 pounds occasionally, 10 pounds frequently; in an eight-hour workday, she can stand/walk a total of six hours; she can reach overhead only occasionally on the right and with less than five pounds; she can frequently balance and occasionally stoop, kneel, crawl, and climb ramps or stairs; she should never climb ladders, ropes, or scaffolds. The [plaintiff] can understand and remember only simple instructions and can sustain attention to complete simple repetitive tasks where production quotas are not critical; she can tolerate co-workers and

3

supervisors with only limited interpersonal demands in an object-focused nonpublic work setting; and she can adapt to routine changes in a simple work setting.

6. The [plaintiff] is unable to perform any past relevant work (20 CFR 404.1565).

7. Born [in] . . . 1962, the [plaintiff] was 45 years old, which is defined as a "younger individual age 18-49," on the alleged disability onset date (20 CFR 404.1563).

8. The [plaintiff] has a "marginal" education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not she has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1569 and 404.1569(a)).[1]

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from September 22, 2008, through the date of [the ALJ's] decision (20 CFR 404.1520(g).

(Tr. 24-34).

### C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a two-fold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

---

[1]The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative unskilled light occupations such as cleaner/housekeeper (1,500 jobs regionally and 275,000 jobs nationally), inspector (1,000 jobs regionally and 269,000 jobs nationally), and hand packager (1,600 jobs regionally and 189,000 jobs nationally).  (Tr. 34, 112).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination.  Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746).  *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

**D.  Specific Errors**

The pertinent medical findings and opinions have been adequately summarized by plaintiff in her Statement of Errors (Doc. 13 at 2-14) and will not be repeated here.  Where applicable, the Court will identify the medical evidence relevant to its decision.

On appeal, plaintiff assigns two errors.  First, plaintiff argues that the ALJ erred in weighing the opinion evidence and determining plaintiff's RFC.  Specifically, plaintiff alleges that the ALJ erred by disregarding the opinions of the treating psychiatrist, Dr. Tarakad Natarajan, M.D., and plaintiff's therapist, Daniel Watson, LISW; improperly rejecting the

5

testimony of plaintiff's case manager, Thomas Van Brunt; and improperly relying upon the opinions of the medical experts, Dr. Mary Buban, Psy.D., and Dr. Hugh Savage, M.D. Second, plaintiff alleges that the ALJ erred by improperly assessing her credibility.

### 1. The ALJ did not err in weighing the opinion evidence of record.

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

"Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)). *See also Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). If the ALJ declines to give a treating source's opinion controlling weight, the ALJ must balance the factors set forth in 20 C.F.R. § 404.1527(c)(2)-(6) in determining what weight to give the opinion. *See Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544. These factors include the length, nature and

extent of the treatment relationship and the frequency of examination. 20 C.F.R. § 404.1527(c)(2)(i)(ii); *Wilson*, 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(3)-(6); *Gayheart,* 710 F.3d at 376; *Wilson*, 378 F.3d at 544.

"Importantly, the Commissioner imposes on its decision makers a clear duty to 'always give good reasons in [the] notice of determination or decision for the weight [given a] treating source's opinion.'" *Cole*, 661 F.3d at 937 (citing former 20 C.F.R. § 404.1527(d)(2)[1]). *See also Wilson*, 378 F.3d at 544 (ALJ must give "good reasons" for the ultimate weight afforded the treating physician opinion). Those reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937 (citing SSR 96-2p).

Only "acceptable medical sources" as defined under 20 C.F.R. § 404.1513(a) can provide evidence which establishes the existence of a medically determinable impairment, give medical opinions, and be considered treating sources whose medical opinions may be entitled to controlling weight. SSR 06-03p. Licensed social workers are not "acceptable medicals sources" under the regulations but instead fall under the category of "other sources." *Id.* (citing 20 C.F.R. § 404.1513(d)(1)). Although information from "other sources" cannot establish the existence of a medically determinable impairment, the information "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." *Id.* Factors to be

---

[1] Title 20 C.F.R. § 404.1527 was amended effective March 26, 2012. The provision governing the weight to be afforded a medical opinion that was previously found at § 404.1527(d) is now found at § 404.1527(c).

considered in evaluating opinions from "other sources" who have seen the claimant in their professional capacities include the nature and extent of the relationship, the source's qualifications and specialty or area of expertise, how consistent the opinion of the source is with other evidence, the degree to which the source presents relevant evidence to support his opinion, and any other factors that tend to support or refute the opinion. *Id. See also Cruse v. Commissioner of Social Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). Not every factor will apply in every case. SSR 06-03p.

### A. The opinion evidence related to plaintiff's mental impairments

Plaintiff argues that the ALJ improperly disregarded a total of three assessments/opinions issued by Dr. Natarajan, her treating psychiatrist at Life Point Solutions, and Mr. Watson, her treating therapist at Life Point. Mr. Watson counseled plaintiff several times between April and August 2010. (Tr. 891-901). In September 2010, Mr. Watson met with plaintiff to complete an Adult Diagnostic Assessment and Individual Service Plan. (Tr. 940-964). Mr. Watson noted that plaintiff came to counseling seeking continued help for mental health issues consisting of depression, mania, marital issues, audio and visual hallucinations (*i.e.*, seeing a little man behind her) and anxiety. (Tr. 957). She was diagnosed as bipolar, depressed with psychosis, and "O.C.D." (obsessive compulsive disorder). (Tr. 947). Mr. Watson continued to counsel plaintiff on a weekly or biweekly basis starting in October 2010. (Tr. 923, 928, 932, 935-38, 1019-1023, 1026-1027, 1030, 1033, 1038, 1040, 1198-1207).

Dr. Natarajan began following plaintiff for medication monitoring in November 2010, and generally saw her once every several weeks. (Tr. 924-27, 929-30, 933-34, 1143-50, 1195-

1196).  Dr. Natarajan completed a Psychiatric Intake Form on November 23, 2010.[2]  (Tr. 933-
34).  He wrote that plaintiff had seen other providers in the past and had two prior
hospitalizations, including a 7-day hospitalization in 2005 and a 5-day hospitalization in 2010 for
suicidal ideation.  (Tr. 933).  Dr. Natarajan reported that plaintiff complained of a visual
hallucination which had persisted since 2007, consisting of a man-like figure behind her back.
(Tr. 934).  He reported that plaintiff's mood was depressed, her thoughts were organized, and her
memory was intact.  (Id.).  Dr. Natarajan assigned plaintiff a GAF of 50.[3]

 Dr. Natarajan signed two Mental Impairment Questionnaires which had been completed
by Mr. Watson.[4]  The first questionnaire was signed by Mr. Watson on January 7, 2011, and by
Dr. Natarajan on January 18, 2011.  (Tr. 916-21).  Mr. Watson wrote that plaintiff had received
psychotherapy and psychiatric medication at Life Point on a weekly to monthly basis since
September 27, 2010.  (Tr. 916).  Her diagnoses included Bipolar Disorder with Psychosis and
"situation with daughter."  (Id.).  Plaintiff was assigned a GAF of 55.[5]  Mr. Watson wrote that
plaintiff showed only a moderate response to treatment and her mood swings and likely
psychotic features continued.  (Id.).  Her medications included Effexor, Klonopin, Lithium, and
Trazadone.  (Id.).  The clinical findings included alternating periods of depression and mania and
delusions with psychotic features.  (Id.).  Plaintiff's prognosis was for a "limited recovery."

---

[2] Dr. Natarajan's writing is difficult to decipher.  The Court has relied on those portions of his records that are
legible.
[3] A GAF score represents "the clinician's judgment of the individual's overall level of functioning."  American
Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, p. 32 (4th ed., text rev. 2000).  The
GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social and
occupational functioning."  Id.  The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of
severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with
clear expectation of death).  Id. at 34.  The DSM-IV categorizes individuals with scores of 41 to 50 as having
"serious" symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or "any serious
impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Id.
[4] As stated by the ALJ in his decision, it is apparent from the handwriting that Mr. Watson completed the
questionnaires.  (Tr. 32).
[5] The DSM-IV, p. 34, categorizes individuals with scores of 51-60 as having "moderate" symptoms.

9

(*Id.*). Mr. Watson opined that plaintiff was "unable to meet competitive standards" in six of the mental abilities and aptitudes needed to do unskilled work due to active bipolar disorder with delusions and "rapid cycling," whereby plaintiff alternated "between extreme lows and highs"; she was "unable to meet competitive standards" in all mental abilities and aptitudes needed to do semiskilled and skilled work; and the mental abilities and aptitudes needed to do particular types of jobs ranged from "unlimited or very good" to "seriously limited, but not precluded" due to her bipolar disorder with extreme lows and highs, delusions about her neighbor, and inability to tolerate normal work stresses. (Tr. 918-19). Mr. Watson opined that plaintiff had the following functional limitations: "none to mild" restriction of activities of daily living; moderate difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; and four or more episodes of decompensation within a 12-month period, each of at least two-weeks duration.[6] (Tr. 919).

Dr. Natarajan issued the second questionnaire on April 1, 2011, and Mr. Watson did not sign the form despite having obviously completed it. (Tr. 1089-94). Dr. Natarajan reported that plaintiff had been treated at Life Point Solutions since August 2010, where she saw a case manager weekly and a psychiatrist every six weeks. (Tr. 1089). Her diagnoses included Bipolar I disorder, "marital/divorce situation," and obsessive compulsive disorder. (*Id.*). Dr. Natarajan assigned plaintiff a GAF of 45. (*Id.*). Dr. Natarajan described plaintiff's treatment as regular

---

[6] "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode. The term repeated episodes of decompensation, each of extended duration in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1.

10

check-ups to adjust medication, case management to connect plaintiff to services and organize treatment, and weekly therapy. (*Id.*). Dr. Natarjan reported that plaintiff's response had been "slow steady improvement." (*Id.*). He described the clinical findings as bipolar disorder with psychotic features, periods of clinical depression with some manic symptoms, paranoid delusions, ongoing psychosis, and visual hallucinations. (*Id.*). Dr. Natarajan described plaintiff's mental illness as "severe, debilitating and life impairing. It significantly impairs her ability to work." (*Id.*). Dr. Natarajan opined that plaintiff was not likely to improve any time soon to the point where she could work consistently. (*Id.*). He indicated that plaintiff was "unable to meet competitive standards" in four of the mental abilities and aptitudes needed to do unskilled work and that she was "seriously limited, but not precluded" in all of the mental abilities and aptitudes needed to do semiskilled and skilled work and to do particular types of jobs. (Tr. 1091-92). Dr. Natarajan opined that plaintiff had marked restriction of activities of daily living; moderate difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; and one or two episodes of decompensation within a 12 month period, each of at least two weeks duration. (Tr. 1092). Dr. Natarajan also opined that plaintiff had a "[c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement." (Tr. 1093). He opined that plaintiff's impairments would cause her to be absent from work more than four days per month and that her impairment could be expected to last at least 12 months. (*Id.*).

Mr. Watson wrote a letter dated April 8, 2011, verifying that plaintiff had begun receiving mental health services in August 2010 after previously receiving them in 2007. Mr. Watson reported that plaintiff was being treating for Bipolar Affective Disorder with Psychosis

(delusional thinking and possible visual hallucinations) and that she had undergone two

psychiatric hospitalizations since 2005, the most recent in August of 2010. Mr. Watson stated

that her condition was "severe enough that she has . . . necessitated the services of a Case

Manager" in addition to the services of a therapist and psychiatrist. He wrote that her mental

illness is chronic, severe and debilitating and it significantly impairs her ability to maintain any

type of gainful employment. Mr. Watson opined:

> She is unable to currently tolerate normal work stressors. Due to the length and
> severity of Kathleen's mental illness it is very unlikely she would be able to
> sustain any type of employment in the near future (she may never be able to work
> again). In fact, any attempts currently to engage in employment could put her in
> serious danger of decompensation and possible further psychiatric hospitalization
> . . . .

(Tr. 1053).

The ALJ gave "little weight" to Dr. Natarajan's mental health questionnaires and the

April 8, 2011 statement of Mr. Watson. (Tr. 32). First, the ALJ noted that although the

questionnaires bore Dr. Natarajan's signature, the handwriting showed they were clearly filled

out by Mr. Watson, a social worker. (*Id.*). Second, the ALJ found that although the

questionnaires were completed only three months apart, they were inconsistent with each other in

terms of the severity of plaintiff's functional limitations. (*Id.*). Third, the ALJ determined that

the questionnaires were not supported by Dr. Natarajan's treatment notes. (*Id.*). The ALJ

specifically relied on Dr. Natarajan's January 27, 2011 and March 1, 2011 treatment notes and

numerous findings set forth in those notes. (*Id.*, citing Tr. 1145, 1147).

Plaintiff argues that the ALJ erred by discounting Dr. Natarajan's assessments. Plaintiff

contends that the fact Mr. Watson completed the questionnaires is irrelevant because Dr.

Natarajan signed them and thereby certified his agreement with the questionnaires' contents.

12

Second, plaintiff alleges that the ALJ was incorrect to the extent he found Dr. Natarajan's notes indicated "willful noncompliance" by plaintiff with her medication regime.[7] (Doc. 13 at 19). Third, plaintiff contends the ALJ was not entitled to discount the opinions based on inconsistencies in the functional limitations assessed because it is expected that plaintiff would have improved with treatment and the limitations imposed are, for the most part, consistent with each other.

The ALJ gave "good reasons" for discounting the opinions of plaintiff's treating psychiatrist, Dr. Natarajan, and those reasons are substantially supported by the evidence of record. The ALJ noted that the treating psychiatrist was not the author of the reports but did not discount Dr. Natarajan's opinions for that reason alone. Rather, the ALJ reasonably relied on inconsistencies between Dr. Natarajan's contemporaneous treatment notes and the findings in the questionnaires to discount Dr. Natarajan's opinions. Dr. Natarajan's January 27, 2011 treatment notes reflect that plaintiff complained of some increase in anxiety due to recent stress-inducing events, including harassment by her ex-husband, her plans to serve legal papers on him, and her daughter's use of illegal drugs. (Tr. 1147). Nonetheless, despite these personal stressors, Dr. Natarajan reported that plaintiff's appearance and demeanor were appropriate and pleasant. Her behavior and affect were appropriate and her cognition was normal. She displayed no psychosis and no overt mood instability. She denied any suicidal ideation. Plaintiff reported that she had not taken her medications the prior week and had experienced withdrawal symptoms, but Dr. Natarajan reported that she was now back taking her medications regularly and that her symptoms showed improvement when she took her medications; *i.e.*, she felt more energetic and

---

[7] This is an apparent reference to the following factual finding by the ALJ: "On January 27, 2011, Dr. Natarajan wrote that the claimant was 'now back to taking her meds regularly' [suggesting that she had not always been compliant]. . . ." (Tr. 32, citing Tr. 1147).

less depressed.[8] (Tr. 1147). Dr. Natarajan's largely normal findings in his January 27, 2011 treatment notes and his report that plaintiff improved when she took her medications were not consistent with the reported clinical findings made in the mental impairment questionnaire he signed just nine days earlier, which reported that plaintiff suffered from alternating periods of depression and mania with "rapid cycling" between "extreme lows and highs" and marked by delusions with psychotic features. (Tr. 916, 918-19). Further, the prognosis for a "limited recovery" made in the questionnaire appeared to be inconsistent with Dr. Natarajan's treatment notes indicating that plaintiff showed improvement when she took her medications. (Tr. 1147).

Similarly, Dr. Natarajan's treatment notes are not consistent with findings he made in the April 2011 medical impairment questionnaire. On March 1, 2011, Dr. Natarajan reported an increase in complaints of anxiety and panic symptoms recently, with plaintiff taking more Klonopin, including three since the last visit. (Tr. 1145). However, plaintiff's appearance and demeanor were appropriate and pleasant. Her thought process was organized with no psychosis. Plaintiff displayed no overt mood instability. Her judgment was appropriate and her mood was euthymic. She denied any suicidal ideation. Her behavior was appropriate and her cognition was normal. She denied any mood swings, mania, hypomania or depression. However, despite reporting no psychosis in his March 2011 treatment notes, Dr. Natarajan reported paranoid delusions, ongoing psychosis, and visual hallucinations in the April 8, 2011 questionnaire. (Tr. 1089). In addition, while Dr. Natarajan reported normal findings on the mental status exam in March 2011, the following month he described plaintiff's mental illness as "severe, debilitating and life impairing" and reported that "[i]t significantly impairs her ability to work." (*Id.*). Thus,

_____

[5] Plaintiff's counsel asserts that Dr. Natarajan attributed plaintiff's failure to take her medication to a memory problem. (Doc. 13 at 19, citing Tr. 1147). In fact, the treatment records simply note that plaintiff forgot to take her medication but do not attribute the oversight to a memory problem. (Tr. 1147).

14

the ALJ's finding that Dr. Natarajan's April mental health assessment was inconsistent with his treatment notes from the prior month is substantially supported by the record.

In addition, substantial evidence supports the ALJ's determination that the two questionnaires signed by Dr. Natarajan, though completed only three months apart, are inconsistent in terms of the severity of plaintiff's functional limitations. (*Id.*). Dr. Natarajan reported in January 2011 that plaintiff had "four or more" episodes of decompensation over the preceding 12 months (Tr. 919), but in April 2011 he reported that plaintiff had experienced "one or two" episodes of decompensation. (Tr. 1092). Dr. Natarajan did not provide an explanation for the discrepancy. Furthermore, whereas in January 2011 Dr. Natarajan opined that plaintiff's degree of restriction of activities of daily living was "none-mild" (Tr. 919), in April 2011 he opined that plaintiff's degree of impairment in this area was "marked." (Tr. 1092). Moreover, Dr. Natarajan inexplicably reported in April 2011 that plaintiff had a "[c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement" (Tr. 1093), despite having made no such finding only three months earlier. (Tr. 920). In addition, although Dr. Natarajan assigned plaintiff a GAF score of 55 in January 2011, which indicated moderate symptoms (Tr. 916), in April he assigned a GAF of 45, which indicated serious symptoms. (Tr. 1089). Dr. Natarajan also reported in April that 45 had been the highest GAF score over the past year even though he had assigned a GAF of 55 just three months earlier. (Tr. 1089, 916).

The ALJ was likewise entitled to discount Dr. Natarajan's assessments given the inconsistencies in the ratings as to the degree of limitation in plaintiff's mental abilities. Between January and April 2011, Dr. Natarajan noted some improvement in the mental abilities and aptitudes needed to perform unskilled work and consistent improvement across categories in

15

the ability to perform semiskilled and skilled work.  (Tr. 918, 1091).  However, he found

appreciable deterioration in plaintiff's mental abilities and aptitudes needed to do particular types

of jobs.  Specifically, in January 2011, Dr. Natarajan rated all mental abilities and aptitudes

needed to do particular types of jobs, except the ability to travel in unfamiliar places, as either

"unlimited or very good" or "limited but satisfactory."  (Tr. 919).  Yet, in April Dr. Natarajan

concluded that plaintiff's mental abilities were "seriously limited, but not precluded" in each of

these same areas, including interacting appropriately with the general public; maintaining

socially appropriate behavior; adhering to basic standards of neatness and cleanliness; and using

public transportation.  (Tr. 1092).  Dr. Natarajan gave no explanation for the significant decline

in these particular mental abilities over the preceding three months despite the noted

improvement in other work-related mental abilities, and he included no supporting

medical/clinical findings for these ratings in the space provided on the April questionnaire.  (*Id.*).

Thus, the reasons for the substantial discrepancies in the assessments Dr. Natarajan

issued only three months apart in January and April 2011 are not clear from the information he

provided in the questionnaires.  Dr. Natarajan found significant deterioration in numerous

functional limitations and work-related mental abilities and aptitudes over this three-month

period.  Yet, Dr. Natarajan reported that plaintiff had shown "slow steady improvement" during

this same period of time.  (Tr. 1089).  The ALJ was entitled to discount Dr. Natarajan's mental

health assessments given the unexplained inconsistencies in the assessments.  *See* 20 C.F.R. §

404.1527(d)(3).

The ALJ likewise gave "little weight" to Mr. Watson's opinions set forth in his April 8,

2011 letter that (1) any attempts by plaintiff to engage in employment could place her in serious

danger of decompensation and additional psychiatric hospitalizations, and (2) "[d]ue to the

16

length and severity of [plaintiff's] mental illness it is very unlikely she would be able to sustain

any type of employment in the near future (she may never be able to work again)." (Tr. 32,

citing Tr. 1053). The ALJ discounted Mr. Watson's opinion on two grounds. First, the ALJ

found Mr. Watson's opinions were contrary to Dr. Natarajan's records indicating that when

plaintiff was compliant with her medications, her depressive and manic symptoms were under

reasonable control. (*Id*.). Second, the ALJ found the opinions were contradicted by plaintiff's

demonstrated capacity to tolerate higher levels of stress than she would typically encounter in

work situations which did not entail time constraints or production quotas. (Tr. 32-33).

The ALJ was not bound to accept Mr. Watson's opinion that plaintiff is disabled and that

engaging in work activity would likely cause her to decompensate and be hospitalized. Mr.

Watson, a licensed social worker, is not an "acceptable medical source" under the regulations but

instead falls under the category of "other sources." *Id*. (citing 20 C.F.R. § 404.1513(d)(1)). His

opinion therefore is not entitled to the deference afforded a treating physician's opinion. *See*

SSR 06-03p.

Moreover, Mr. Watson's opinion about plaintiff's inability to work is not entitled to any

weight for the additional reason that whether a person is disabled within the meaning of the

Social Security Act is an issue reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(d)(1);

SSR 96-5p, 1996 WL 374183 (July 2, 1996) (an opinion by a treating source that his patient is

disabled is not given any special significance, even if the opinion is rendered by a treating

physician).

In addition, the ALJ gave valid reasons for discounting Mr. Watson's opinion that

plaintiff would decompensate if required to work and cited evidence to support his reasons.

Plaintiff alleges that the ALJ erred by discrediting Mr. Watson's opinion because she purportedly

showed signs of decompensation in response to the personal stressors in her life, including

descending into a deeper depression, isolating herself, and disregarding her need for food and

sleep. (Doc. 13 at 20, citing Tr. 1114-1150, 1188-1207). In fact, though, while plaintiff

experienced anxiety and other psychological symptoms in response to severe personal stressors,

the record supports the ALJ's finding that plaintiff handled these situations without

decompensating. Plaintiff was hospitalized once for psychiatric care during the period of alleged

disability, which was prior to the start of regular treatment at Life Point Solutions. Plaintiff was

referred for psychiatric hospitalization briefly in July 2010 after her husband left her and she

presented to the emergency room with suicidal ideation, depression and hopelessness. (Tr. 868-

871). However, she denied psychosis, paranoia, and hallucinations at that time. (Tr. 868-870).

The attending physician, Dr. Rodney Vivian, M.D., questioned whether a recently added

medication, Risperdal, might have been adding to plaintiff's anxiety. (Tr. 870). Plaintiff was

discharged in stable condition after two days and was assigned a GAF of 60 at that time. (Tr.

868). Plaintiff subsequently complained to both Mr. Watson and Dr. Natarajan of increased

anxiety when dealing with highly stressful situations in her personal life, which included

instituting divorce proceedings against her abusive husband, who had threatened her with a gun

at one point. (Tr. 1198). However, as Dr. Natarajan reported in January 2011, plaintiff's

symptoms were reasonably well-controlled with medication (Tr. 1147), and by April 2011

plaintiff had shown slow and steady improvement in response to mental health treatment (Tr.

1089). For these reasons, the ALJ's decision to discount Mr. Watson's opinion that plaintiff

would decompensate if required to work is substantially supported by the record.

Instead of crediting the opinions of plaintiff's treating psychiatrist, Dr. Natarajan, and

plaintiff's treating therapist, Mr. Watson, the ALJ gave "great weight" to the opinion of the

medical expert, Dr. Mary Buban, Psy.D., that plaintiff is capable of performing simple, routine tasks and interacting superficially with others, but she requires a job with low time and production standards/quotas. (Tr. 32, citing Tr. 1047, 1215). The ALJ found that Dr. Buban had a superior longitudinal record to consider, she was familiar with the Social Security regulations, and her assessment was consistent with the opinions of the consultative examining psychologists, Dr. George Lester, Psy.D., and Dr. William F. Vonderhaar, Ph.D., and with the opinions of the state agency reviewing psychologists, Dr. Steven J. Meyer, Ph.D., and Dr. Vicki Warren, Ph.D. (Tr. 32).

Plaintiff argues that the ALJ was not entitled to rely on Dr. Buban's opinion because it is not supported by the evidence; it is not consistent with the opinions of plaintiff's treating physicians; Dr. Buban improperly focused on the fact that plaintiff did not begin psychological treatment until April 2010 and the fact that plaintiff reported she was obtaining treatment in order to seek assistance in obtaining Social Security benefits; Dr. Buban improperly focused on a single progress note from June 2010 to support her conclusions while ignoring the vast majority of the treatment records which showed much more severe symptomatology; Dr. Buban focused on those portions of the record that supported her preconceived view of plaintiff's mental issues; Dr. Buban's analysis is insufficient to support her conclusions; Dr. Buban failed to discuss the issue of borderline intellectual functioning; and Dr. Buban "seemed to disregard the progress notes of the various treating mental health professionals who reported that Plaintiff continued to show signs of significant depression and continued to experience auditory and visual hallucinations, despite treatment with a number of different medications." (Doc. 13 at 23, citing Tr. 922-964, 1018-1042, 1052-53, 1088-94, 1114-1150, 1188-1207). For these reasons, plaintiff

argues that the ALJ's reliance on Dr. Buban's opinion was "irrational" and is grounds for reversal. (Doc. 13 at 24).

Medical expert testimony consistent with the evidence of record can constitute substantial evidence to support the Commissioner's decision. *Atterberry v. Sec'y of Health & Human Servs.*, 871 F.2d 567, 570 (6th Cir. 1989). Because a non-examining source has no examining or treating relationship with the claimant, the weight to be afforded the opinion of a non-examining source depends on the degree to which the source provides supporting explanations for her opinions and the degree to which her opinion considers all of the pertinent evidence in the record, including the opinions of treating and other examining sources. 20 C.F.R. § 404.1527(c)(3).

Here, a review of the record demonstrates that the ALJ's decision to give Dr. Buban's opinion "great weight" finds substantial support in the record. There is no indication that Dr. Buban failed to review all of the medical evidence of record or failed to consider pertinent evidence in fashioning her opinion as to plaintiff's mental functional limitations. Nor has plaintiff demonstrated that Dr. Buban harbored a preconceived notion as to plaintiff's mental abilities which led her to improperly focus on only portions of the record and ignore other parts of the record which favored plaintiff. To the contrary, Dr. Buban completed two sets of interrogatories, the first in April 2011 (Tr. 1043-1047) and the second in July 2011 (Tr. 1211-1215). In April 2011, Dr. Buban opined that plaintiff had no restriction in activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence or pace. Dr. Buban did not mark any number of episodes of decompensation of an extended duration, but she wrote that plaintiff had been hospitalized two times, including once in January 2007. (Tr. 1044). In support of her opinions, Dr. Buban

20

wrote that the majority of the records documented depression; plaintiff returned to work after the 2007 hospitalization, which predated the alleged disability onset date; and plaintiff began treatment on April 22, 2010, seeking help to obtain disability benefits for symptoms including chronic suicidal ideation, sadness, inability to relax, and auditory and visual hallucinations, which were first referenced the same month she began treatment. (Tr. 899). Dr. Buban noted that prior to plaintiff's hospitalization in June-July 2010, plaintiff experienced extreme stressors which could result in a decompensation; *i.e.*, her husband had threatened her with a gun, plaintiff and her husband separated, and plaintiff became homeless. (Tr. 1044). However, the hospitalization records reflected that plaintiff denied hallucinations and she had only a vague suicide plan. (*Id.*, citing Tr. 867-880). Dr. Buban opined that plaintiff's mental impairments did not meet or equal a Listing and that the "C" criteria were not satisfied. (Tr. 1045-46). Dr. Buban opined that the majority of the record supported the conclusions of the state agency reviewing psychologist, Dr. Warren. (Tr. 1047, citing Tr. 846). Dr. Buban concluded that plaintiff could carry out "simple/moderately complex tasks of a routine nature," she could "get along with others in a routine environment superficially," and she could handle "[l]ow time and production standards." (Tr. 1047).

In July 2011, Dr. Buban found that the records subsequent to April 5, 2011, did not change plaintiff's diagnoses and that the mental health treatment focused on supporting plaintiff through stressful situations which included the process of divorce, her daughter's drug use, her husband's threats of violence, completion of social security forms, and referrals for support services for victims of violence. (Tr. 1211). Dr. Buban modified the functional limitations somewhat and found that plaintiff had no restriction of activities of daily living; moderate difficulties in maintaining social functioning; mild to moderate difficulties in maintaining

21

concentration, persistence or pace; and no episodes of decompensation of an extended duration.
(Tr. 1212). Dr. Buban imposed the same work limitations set forth in the January 2011
interrogatory answers. (Tr. 1215).

Dr. Buban also testified at the ALJ hearing. (Tr. 62-70). Dr. Buban stated that she did
not detect any significant change in plaintiff's mental health between January and April 2011
and, if anything, her review of the records showed some improvement in plaintiff's mental
condition. (Tr. 64). Dr. Buban noted that plaintiff did continue to have some issues with
anxiety. (Tr. 66).

Dr. Buban's opinion is consistent with the opinions rendered by all the examining and
reviewing psychologists of record, each of whom found only moderate mental functional
limitations. Dr. Lester examined plaintiff on behalf of the state agency in July 2009. (Tr. 697-
704). Dr. Lester assessed a mood disorder and an IQ estimated to be in the borderline range. He
assigned plaintiff a GAF score of 60, indicative of moderate symptoms. (Tr. 702). Dr. Lester
opined that plaintiff would have moderate limitations in all four areas of work-related mental
abilities. (Tr. 702-03).

Dr. Vonderhaar evaluated plaintiff in December 2009. (Tr. 823-829). He assigned
plaintiff a GAF score of 60. Dr. Vonderhaar opined that plaintiff's mental ability to relate to
others, including fellow workers and supervisors, is moderately impaired due to her passive and
ongoing depressive disorder as well as inability to read or write on an effective level; her ability
to understand, remember and follow instructions is moderately impaired due to her borderline
intellectual capabilities and inability to read or write at an effective level; her mental ability to
maintain attention and concentration, persistence and pace to perform routine tasks is moderately
impaired given her medical complaints related to her right upper extremity and her inability to

22

understand any instructions beyond the most routine and simple explanations; and her mental ability to withstand the stress and pressures associated with day to day work activity is moderately impaired and she would best be able to function effectively when performing "the most simple and routine activities." (Tr. 828).

Drs. Meyer and Warren completed Psychiatric Review Techniques and Mental RFC Assessments in August 2009 and December 2009, respectively. (Tr. 705-21, 830-846). They each opined that plaintiff had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation of an extended duration. (Tr. 715, 840). The reviewing psychologists gave "great weight" to the moderate limitations imposed by Dr. Lester. (Tr. 721, 846). They concluded that plaintiff has the ability to understand, remember and carry out simple/moderately complex routine tasks; she can adapt to changes in the work environment that are routine and easily explainable; she can get along with others, including supervisors and co-workers, on at least a superficial basis; and she should work in an environment with low time and production standards. (Tr. 721, 846).

Dr. Buban's opinion is consistent with the numerous opinions rendered by the examining and reviewing mental health sources in this case. The ALJ gave valid reasons for adopting these opinions over the opinions of plaintiff's treating psychiatrist and therapist. *See* 20 C.F.R. § 404.1527(e)(2)(i) ("State agency medical and psychological consultants . . . are highly qualified physicians [and] psychologists . . . who are also experts in Social Security disability evaluation," and whose findings and opinions the ALJ "must consider . . . as opinion evidence."). The opinions of such consultants may be entitled to significant weight where, as here, they are supported by record evidence, including that from plaintiff's own physicians.

23

In addition to arguing that the ALJ erred in weighing Dr. Buban's opinion when assessing plaintiff's RFC, plaintiff argues that the ALJ erred by relying on Dr. Buban's opinion to find that her mood disorder does not meet Listing 12.04 for affective disorders.[9] Plaintiff alleges that in accordance with Dr. Natarajan and Mr. Watson's opinions, she has experienced repeated episodes of decompensation of an extended duration and marginal adjustment; she has marked difficulties in maintaining concentration, persistence or pace; and she had delusions about her neighbor and rapid cycling bipolar disorder which alternated between extreme lows and highs, together with appetite disturbance with weight change, decreased energy, paranoid thinking or inappropriate suspiciousness, and sleep disturbances. (Doc. 13 at 21-22). Plaintiff

---

[9] Listing 12.04 states: "The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
A. Medically documented persistence, either continuous or intermittent, of one of the following:
1. Depressive syndrome characterized by at least four of the following:
a. Anhedonia or pervasive loss of interest in almost all activities; or b. Appetite disturbance with change in weight; or c. Sleep disturbance; or d. Psychomotor agitation or retardation; or e. Decreased energy; or f. Feelings of guilt or worthlessness; or g. Difficulty concentrating or thinking; or h. Thoughts of suicide; or i. Hallucinations, delusions, or paranoid thinking; or
2. Manic syndrome characterized by at least three of the following:
a. Hyperactivity; or b. Pressure of speech; or c. Flight of ideas; or d. Inflated self-esteem; or e. Decreased need for sleep; or f. Easy distractibility; or g. Involvement in activities that have a high probability of painful consequences which are not recognized; or h. Hallucinations, delusions or paranoid thinking;
or
3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);
AND
B. Resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration;
OR
C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement."

24

alleges that the ALJ erred by rejecting evidence about her delusions as inconsistent. (*Id.* at 22-23).

For the reasons explained above, substantial evidence supports the ALJ's decision to accept Dr. Buban's opinion that plaintiff had only moderate mental limitations and to reject Dr. Natarajan's opinion that plaintiff has "marked" restrictions as contradictory and inconsistent with plaintiff's activities of daily living. (Tr. 29). Further, the record supports the ALJ's finding that while plaintiff experienced one episode of decompensation after the alleged disability onset date, there have been no episodes of decompensation of an "extended duration" as that term is defined under the Social Security regulations. *See* 20 C.F.R. § 404 Appendix 1, 12.00(C)(4) (the term "repeated episodes of decompensation, each of extended duration," means "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks."). Accordingly, the ALJ did not err by failing to find plaintiff suffers from an impairment that satisfies the Listing. Substantial evidence supports the ALJ's findings that plaintiff's mental impairments impose only moderate limitations on her ability to function and she does not have a mental impairment that meets or equals a listed impairment. (Tr. 29).

Finally, plaintiff has not shown that the ALJ improperly rejected the testimony of her case manager, Mr. Van Brunt, who is categorized as an "other source" under the regulations. *See* 20 C.F.R. § 404.1513(d). The ALJ considered Mr. Van Brunt's testimony but determined it was not entirely reliable because counsel had elicited his testimony through the use of leading questions and his opinions appeared to have been significantly influenced by plaintiff's subjective reports of her symptoms and limitations, which the ALJ found were not wholly credible. (Tr. 33). The ALJ was entitled to discount the case manager's testimony on these grounds. Plaintiff has not shown that the ALJ erred in this regard.

For these reasons, the ALJ did not err in weighing the medical opinion evidence related to plaintiff's mental impairments.

### B. The opinion evidence related to plaintiff's physical impairments

Plaintiff contends that the ALJ improperly relied on testimony regarding her physical impairments provided by the medical expert, Dr. Hugh Savage, M.D. Plaintiff argues that Dr. Savage's opinion is inconsistent with the medical exhibits and is illogical because (1) Dr. Savage's findings related to her aneurysm are not supported by the evidence, and (2) Dr. Savage's opinion about the functional limitations resulting from plaintiff's right shoulder impairment is not well-supported because Dr. Savage improperly relied on an impairment rating made by the Ohio Bureau of Workers' Compensation ("BWC"). (Doc. 13 at 24-27).

The ALJ gave "great weight" to Dr. Savage's interrogatory responses (Tr. 1217-19) and the testimony Dr. Savage gave at the ALJ hearing (Tr. 48-62). (Tr. 31). Dr. Savage opined that plaintiff is able to lift/carry and push/pull 20 pounds occasionally and 10 pounds frequently in an 8-hour workday; stand/walk a total of six hours; reach overhead only occasionally on the right and with less than five pounds due to her right shoulder impairment; frequently balance and occasionally stoop, kneel, crawl and climb ramps or stairs; and never climb ladders, ropes or scaffolds. (Tr. 1219). Dr. Savage relied on a number of findings to support his opinion, including good strength and good range of motion findings made shortly after plaintiff's February 2009 rotator cuff surgery. (Tr. 1218, citing Tr. 575). Dr. Savage noted that plaintiff was released to return to work in May 2009 with a five-pound limit on the injured side. (*Id.*, citing Tr. 571), and she had excellent range of motion and strength ten months after surgery. (*Id.*, citing Tr. 808).[10] Dr. Savage also noted that on November 13, 2009, plaintiff could exert

---

[10] Dr. Savage cites Exh. 13F, p. 5 for this record, but the record is actually found at Exh. 14F, p. 5.

normal grip on rapid alternate grip testing and her total upper extremity impairment was rated at

7%.[11] (*Id.*, citing Tr. 805). These findings substantially support the functional limitations Dr.

Savage assessed, and plaintiff has not pointed to any medical assessments that imposed greater

physical functional limitations. Accordingly, the ALJ did not err by relying on Dr. Savage's

opinion to determine the functional limitations imposed by plaintiff's right shoulder impairment.

Plaintiff also alleges that Dr. Savage committed two errors related to her aneurysm

diagnosis: (1) Dr. Savage confused the terms "medically determinable impairment" and "severe

impairment" when testifying concerning plaintiff's aneurysm; and (2) even if one interprets his

testimony to mean that plaintiff's aneurysm is not a "severe impairment," that testimony is

inconsistent with the evidence of record, which plaintiff suggests shows a link between her

aneurysm and headaches, dizziness and blurred vision. (*Id.* at 24-26, citing Tr. 493-543, 548-

569, 1054-87, 1095-1103).[12] Plaintiff argues these symptoms would impact an individual's

ability to work.

In his responses to the interrogatories, Dr. Savage did not include plaintiff's aneurysm

among those "impairments . . . established by the evidence." (Tr. 1217). Dr. Savage testified at

the ALJ hearing that he did not consider plaintiff's aneurysm to be a "medically determinable

impairment" because the aneurysm had not changed in size over a few years and it was not

causing any functional limitations. (Tr. 50). When asked for his understanding of the term

"medically determinable" impairment," Dr. Savage testified that the impairment must have a

"significant impact on functionality." (Tr. 53). Dr. Savage's testimony indicates that he

confused the terms "medically determinable" and "severe" impairments and that he did not

---

[11] Dr. Andrew W. Cross, M.D., made this finding in connection with an independent medical examination using the AMA Guide to Permanent Impairment (5th ed). (Tr. 805).
[12] The Court has reviewed the transcript pages cited by plaintiff's counsel. Many of the pages include no references to plaintiff's aneurysm or to any of these symptoms.

27

consider the aneurysm to be a "severe impairment" within the meaning of the regulations. *See*

20 C.F.R. § 404.1520(c) (a "severe impairment" is one which significantly limits the physical or

mental ability to perform basic work activities). However, any error Dr. Savage committed in

this regard was harmless. Both Dr. Savage and the ALJ reviewed the evidence related to

plaintiff's aneurysm. The ALJ noted that plaintiff had been followed with periodic angiograms

after being diagnosed with a 3-millimeter aneurysm in the cavernous segment of the left internal

carotid artery in October 2005 (Tr. 26, citing Tr. 517), but it was determined that no treatment

was required at the time of diagnosis and follow-up tests showed the aneurysm had not grown as

of January 2010. (*Id.*, citing Tr. 512, 1100). Dr. Savage testified there was no evidence showing

that the aneurysm was clinically significant or that it was causing any functional limitations,

including headaches, blurred vision, or dizziness. (Tr. 50, 52). Plaintiff's counsel has not

directed the Court to any specific portions of the medical record which show that the aneurysm

did cause symptoms or functional limitations. There are sporadic references to blurred vision in

the record, but plaintiff's treating physician, Dr. Z. George Guo, M.D., attributed this symptom

to recently diagnosed glaucoma (Tr. 550, 5/09 treatment note) and there is no evidence showing

that plaintiff's blurred vision persisted. There is also evidence that plaintiff was treated for

migraine headaches. However, there is no evidence that the headaches were caused by her

aneurysm, and substantial evidence supports the ALJ's finding that plaintiff's migraine

headaches had responded to treatment and were reportedly "stable" during the period of alleged

disability. (Tr. 26, citing Tr. 966; *see also* Tr. 558-59, 8/08- "headache seems to be doing really

well," current treatment to be continued; Tr. 552, 2/09- doing well with headaches, no

exacerbation; Tr. 550-51, 5/09- doing well, no significant headaches except the neck and

shoulder stiffness; Tr. 1100, 1/10- headaches stable; Tr. 1098, 4/10- doing well with headache,

except for posterior neck and suboccipital shooting pain; Tr. 1078, 6/10- migraines stable; Tr. 1057, 11/10- migraines stable, plaintiff to call when refills needed). Thus, neither Dr. Savage nor the ALJ erred by failing to find plaintiff's aneurysm was a "severe impairment" as that term is defined under the regulations.

Accordingly, the ALJ did not err by giving "great weight" to Dr. Savage's opinions and by failing to impose additional functional limitations to account for plaintiff's aneurysm, right shoulder impairment, and other physical symptoms.

### C. Conclusion

Although the evidence documents plaintiff's severe mental and physical impairments, the ALJ's determination that plaintiff's impairments do not preclude her from performing a limited range of light work with non-exertional restrictions is supported by substantial evidence. While the record could conceivably support a contrary finding, the Social Security Act does not permit the reviewing court to resolve conflicts in the evidence. *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). The Court's review is limited to determining whether substantial evidence supports the ALJ's conclusion. Here, the ALJ cited ample evidence to support his conclusion that notwithstanding plaintiff's psychological and physical impairments, she is capable of engaging in substantial gainful employment. The ALJ's finding should not be disturbed. Plaintiff's first assignment of error should be overruled.

### 2. The ALJ did not err in assessing plaintiff's credibility

Plaintiff argues that the ALJ erred by providing illogical reasons for rejecting her testimony regarding her limitations. Specifically, plaintiff contends that the ALJ erred by discounting her testimony that she does not leave the house very often and she has difficulty dealing with other people based on activities plaintiff engages in as part of her treatment

regimen; *i.e.*, meeting with her therapist and case manager every week and taking walks in the park for exercise. (Doc. 13 at 28, citing Tr. 30). Plaintiff further argues that the record does not support the ALJ's finding that she misrepresented to her treating physician that she had been diagnosed with schizophrenia; instead, counsel contends it is logical to assume plaintiff misunderstood her actual diagnosis due to her borderline intellectual functioning. (Doc. 13 at 28). In addition, plaintiff alleges that the ALJ was not entitled to discount her credibility based on her reports to her doctors that she was pursuing disability benefits. (*Id.* at 28-29, citing Tr. 31). Plaintiff also states it is improper for the ALJ to discount her mental health complaints based on observations of her mental functioning made by treating doctors who are not mental health providers. (*Id.* at 29). Finally, plaintiff contends that the ALJ inaccurately characterized her self-reported activities of daily living. (Doc. 13 at 29-30, citing Tr. 78-80, 88, 90-91, 311-12, 326, 335-37).

Title 20 C.F.R. § 404.1529 and Social Security Ruling 96-7p describe a two-part process for assessing the credibility of an individual's statements about her symptoms. First, the ALJ must determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged; second, the ALJ must evaluate the intensity, persistence, and functional limitations of those symptoms by considering objective medical evidence and other evidence, including: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c);

30

SSR 96-7p. "[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility. Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (citing *Villarreal v. Sec'y of Health and Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987)).

In light of the ALJ's opportunity to observe the individual's demeanor at the hearing, the ALJ's credibility finding is entitled to deference and should not be discarded lightly. *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001); *Kirk v. Sec. of H.H.S.*, 667 F.2d 524, 538 (6th Cir. 1981). "If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). The ALJ's articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review." *Hurst v. Sec. of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985) (citing *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984)).

Here, the ALJ's credibility determination is substantially supported by the record and is entitled to deference. The ALJ made valid findings regarding plaintiff's credibility in connection with his determination that plaintiff retained the RFC to perform a reduced range of light work with non-exertional restrictions to account for her mental impairments, and those findings are supported by the substantial evidence of record. (Tr. 29-32).

The ALJ reasonably determined that plaintiff's complaints of disabling symptoms were not entirely credible based on her activities of daily living and other activities. The record demonstrates that despite plaintiff's complaints of disabling anxiety, depression and shoulder pain, she is able to independently attend to her personal hygiene needs, go shopping, prepare

food, drive, and perform some household chores such as cleaning windows, vacuuming, and doing laundry. (Tr. 30, citing Tr. 83-90, 825). Further, although plaintiff testified that she does not leave the house very often, she engaged in a number of activities outside of the home, including volunteering at the VFW where she served food and soft drinks; going to the grocery store every other week; and walking in the park for exercise three days a week. (Tr. 83-85, 88). The ALJ was entitled to discount plaintiff's credibility based on the inconsistencies between reports of her subjective limitations and her daily and other activities. *See Heston v. Commissioner*, 245 F.3d 528, 536 (6th Cir. 2001) (in determining credibility, the ALJ may consider the claimant's testimony of subjective limitations in light of other evidence of the claimant's ability to perform other tasks such as walking for exercise, cooking, vacuuming, and other household and social activities). *See also Blacha v. Secretary*, 927 F.2d 228, 231 (6th Cir. 1990) (the ALJ may consider the plaintiff's household and social activities in evaluating the plaintiff's credibility).

The ALJ was also entitled to discount plaintiff's credibility based on her inconsistent reports of her literacy. Plaintiff informed Dr. Lester that she was illiterate (Tr. 697), and she told Dr. Vonderhaar that she could not read or write and had only a fourth grade education. (Tr. 828). However, plaintiff stated on her disability application that she was able to read and write (Tr. 275) and there were other indications in the record that she was able to do so. (Tr. 30).

Finally, the ALJ was entitled to discount plaintiff's credibility based on inconsistencies between her complaints of psychological symptoms and the severe limitations imposed in her treating therapist and psychiatrists' mental health assessments as compared to the mental health treatment notes. The ALJ also reasonably questioned whether plaintiff was motivated to seek mental health treatment in an effort to secure disability benefits and whether she fabricated

32

symptoms. Although plaintiff underwent a brief psychiatric hospitalization in April 2007, she

subsequently returned to work and was not undergoing treatment with a mental health

professional when evaluated by consultative psychologists Drs. Lester and Vonderhaar in 2009.

Plaintiff did not seek counseling following those evaluations until after her application for DIB

was denied at the reconsideration level (Tr. 28), and the records show she pursued treatment with

the express goal of obtaining disability benefits. According to Mr. Watson's notes, plaintiff

came to Life Point Solutions for counseling in April 2010 because she was "seeking help to

obtain Social Security disability. . . ." (Tr. 899). Treating physician Dr. Guo reported in June

2010 that plaintiff would "continue to see Dr. Geraldine Wu and fight for the social security

disability benefit. . . .," even though Dr. Guo observed nothing abnormal about plaintiff's

behavior or appearance at that time. (Tr. 1096-97- noting that plaintiff appeared to be fully

oriented, her recent and remote memory was intact, and her mood and affect were appropriate;

the history and review of mental systems was positive only for anxiety "due to the social and

family stress. . . ."). Plaintiff told her case manager, Mr. Van Brunt, in December 2010 that her

two goals were to (1) "get benefits" and (2) obtain protection from her husband. (Tr. 1141).

Moreover, once she began treatment, plaintiff reported auditory and visual hallucinations (Tr.

900), but her reports of these symptoms were subsequently inconsistent. (*See, e.g.*, Tr. 869-70,

6/29/10-7/1/10 hospitalization- plaintiff denied psychosis, paranoia, and hallucinations).

Thus, the ALJ's reasons for discounting plaintiff's complaints of allegedly disabling

shoulder pain and psychological symptoms are valid and find substantial support in the record.

The ALJ's credibility determination is therefore entitled to deference. Plaintiff's second

assignment of error should be overruled.

33

**IT IS THEREFORE RECOMMENDED THAT:**

The decision of the Commissioner be **AFFIRMED** and this matter be closed on the docket of the Court.

Date: 4/16/14

Karen L. Litkovitz
United States Magistrate Judge

34

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

KATHLEEN BROWN,                                  Case No. 1:13-cv-267
      Plaintiff,                               Spiegel, J.
                                         Litkovitz, M.J.

      vs.

COMMISSIONER OF
SOCIAL SECURITY,
      Defendant.


**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.  This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).